STATE *vs.* ALBERT F. MATLACK, JAMES WATSON and JOHN M. DONOHOE.

*Information—Demurrer—Pleading—Election Officers—Inspector—Judges—Primary Election—Violation of Official Duties—Constitution—Trial by the Court Without Jury—Evidence.*

1.  Information *held* sufficient on demurrer.

2.  A bail bond is not void under the statute (*Rev. Code, 732–733*), even though it is not attested by the Justice of the Peace ; and purporting to be taken in the case, it is admissible in evidence.

3. The books of qualified voters are the best evidence of an elector's right to vote but he may be asked, as a witness, if he did in fact vote at the election in question.

4. The secrecy attending voting does not prevent the voter from disclosing how he voted if he wishes to do so.

5. A ballot exactly similar to those used and voted at the election is admissible in evidence.

6. A copy of the oath that was administered to the election officer is not admissible in evidence until it is shown that a proper search has been made for the original, and it could not be found.

7. The oath which the primary election law provides shall be administered to election officers is admissible in evidence although it is not the oath which the Constitution provides shall be administered to public officers.

8. Motion to discharge the defendants.

9. The evidence in the case.—Verdict.

(*October 16-20, 1905.*)

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*Robert H. Richards*, Attorney-General, and *Daniel O. Hastings*, Deputy Attorney-General, for the State.

*David J. Reinhardt* and *Walter H. Hayes* for the defendants.

Court of General Sessions, New Castle County, September Term, 1905.

INFORMATION for violation of *Section 7, Article 5, of the Constitution of the State of Delaware*, being for violation of official duty as primary election officers. (No. 11 February Term, 1905). Heard, tried and determined by the Court without the intervention of a jury.

The amended information was as follows:

"February, Term, 1905.

" New Castle County, ss.

"(1) *Robert H. Richards*, Attorney-General of the State of Delaware, now here in the Court of General Sessions of the State of

Delaware, now sitting in and for the County aforesaid, information makes, that Albert F. Matlack, late of Brandywine Hundred, County and State aforesaid, John M. Donohoe, late of the Hundred, County and State aforesaid, and James Watson late of the Hundred, County and State aforesaid, each, on the twenty-first day of December in the year of our Lord, one thousand nine hundred and four, having been brought before George H. Hollis, Esquire, a Justice of the Peace for said State, in and for the County aforesaid, waived an examination and were severally held to bail, by the said Justice of the Peace, in the sum of three hundred dollars for the appearance of the said Albert F. Matlack, John M. Donohoe, and James Watson, respectively, at the present session of said Court of General Sessions, being now here holden in and for said County, to answer to the charge that they, the said Albert F. Matlack, John M. Donohoe and James Watson, at Brandywine Hundred, in the County of New Castle, in the State of Delaware, on the twenty-fourth day of September, in the year of our Lord, one thousand nine hundred and four, he, the said Albert F. Matlack, then and there being an officer, to wit, the presiding officer, and they, the said John M. Donohoe and James Watson, then and there being officers, to wit, Judges, at a certain primary election of the Republican party then and there held under the provision of *Chapter 393, Volume 20, Laws of Delaware*, in the Hundred aforesaid, in the Third Election District of the Sixth Representative District of the County and State aforesaid, did, then and there, knowingly and wilfully violate their official duty in that they did not then and there cause the ballots that had been then and there taken at said Primary Election to be fully read and ascertained, and did not then and there cause a true statement of the ballots then and there taken at said Primary Election, to be made according to the best of their knowledge and ability, in that they read, and caused to be read certain ballots, then and there cast at the said Primary Election for Isaac C. Elliott as Levy Court Commissioner for the Third Levy Court District in said County of New Castle, in favor of a can-

didate or candidates for said office other than the said Isaac C. Elliott.

"And the said Robert H. Richards, Attorney General, as aforesaid, further information makes that the said Albert F. Matlack, late of Brandywine Hundred, in the County of New Castle and State aforesaid, John M. Donohoe, late of the Hundred, County and State aforesaid, and James Watson, late of the Hundred, County and State aforesaid, on the twenty-fourth day of September, in the year of our Lord, one thousand nine hundred and four, with force and arms, at the Hundred aforesaid, in the County aforesaid, then and there being officers of an election, to wit, he, the said Albert F. Matlack, then and there being the presiding officer, commonly known as the inspector, and they, the said John M. Donohoe and James Watson, then and there being judges, at a certain Primary Election of the Republican party, then and there held under the provisions of *Chapter 393, Volume 20, Laws of Delaware*, in the Hundred aforesaid, in the Third Election District of the Sixth Representative District of the County and State aforesaid, did, then and there, unlawfully, knowingly and wilfully violate their official duty in that they did not then and there cause the ballots that had been then and there taken at said Primary Election to be fully read and ascertained, and did not then and there cause a true statement of the ballots then and there taken at said Primary Election to be made according to the best of their knowledge and ability, in that they read and caused to be read certain ballots to the number of seventy-five, then and there cast at the said Primary Election for Isaac C. Elliott for the office of Levy Court Commissioner for the Third Levy Court District in the said County of New Castle, in favor of and as if cast for a candidate or candidates for said office other than the said Isaac C. Elliott;

"And the said Attorney-General further says that they, the said Albert F. Matlack, John M. Donohoe and James Watson, being then and there officers of election, as aforesaid, did, then and there and thereby, knowingly and wilfully, respectively, violate their official duty, contrary to the provisions of the Constitution of

the State of Delaware, in such case made and provided, and against the peace and dignity of the State.

" (2) And the said Robert H. Richards, Attorney-General of the State of Delaware, now here in the Court of General Sessions of the State of Delaware, now sitting in and for the County aforesaid, information makes, that the said Albert F. Matlack, late of Brandywine Hundred, County and State aforesaid, the said John M. Donohoe, late of the Hundred, County and State aforesaid, and the said James Watson, late of the Hundred, County and State aforesaid, each, on the twenty-first day of December, in the year of our Lord, one thousand nine hundred and four, having been brought before George H. Hollis, Esquire, a Justice of the Peace for said State, in and for the County aforesaid, waived an examination and were severally held to bail, by the said Justice of the Peace, in the sum of three hundred dollars for the appearance of the said Albert F. Matlack, John M. Donohoe and James Watson, respectively, at the present session of said Court of General Sessions, being now here holden in and for said County, to answer to the charge that they, the said Albert F. Matlack, John M. Donohoe and James Watson, at Brandywine Hundred, in the County of New Castle, in the State of Delaware, on the twenty-fourth day of September, in the year of our Lord, one thousand nine hundred and four, he, the said Albert F. Matlack, then and there being an officer, to wit, the presiding officer, and they, the said John M. Donohoe and James Watson, then and there being officers, to wit, judges, at a certain primary election of the Republican party then and there held under the provision of *Chapter 393, Volume 20, Laws of Delaware*, in the Hundred aforesaid, in the Third Election District of the Sixth Representative District of the County and State aforesaid, did, then and there, knowingly and wilfully violate their official duty in that they did not then and there cause the ballots that had been then and there taken at said Primary Election to be fully read and ascertained, and did not then and there cause a true statement of the ballots then and there taken at said Primary Election, to be made according to the best of their knowledge and ability.

"And the said Robert H. Richards, Attorney-General, as aforesaid, further information makes that the said Albert F. Matlack, late of Brandywine Hundred, in the County of New Castle and State aforesaid, John M. Donohoe, late of the Hundred, County and State aforesaid, and James Watson, late of the Hundred, County and State aforesaid, on the twenty-fourth day of September, in the year of our Lord, one thousand nine hundred and four, with force and arms, at the Hundred aforesaid, in the County aforesaid, then and there being officers of an election, to wit, he, the said Albert F. Matlack, then and there being the presiding officer, commonly known as the inspector, and they, the said John M. Donohoe and James Watson, then and there being judges, at a certain Primary Election of the Republican party, then and there held under the provisions of *Chapter 393, Volume 20, Laws of Delaware*, in the Hundred aforesaid, in the Third Election District of the Sixth Representative District of the County and State aforesaid, did, then and there, unlawfully, knowingly and wilfully violate their official duty in that they did not then and there cause the ballots that had been then and there taken at said Primary Election to be fully read and ascertained, and did not then and there cause a true statement of the ballots then and there taken at said Primary Election to be made according to the best of their knowledge and ability, in that they then and there permitted certain ballots to the number of seventy-five, then and there cast at the said Primary Election for Isaac C. Elliott for the office of Levy Court Commissioner for the Third Levy Court District in the said County of New Castle, to be read in favor of and as if cast for a candidate or candidates for said office other than the said Isaac C. Elliott.

"And the said Attorney-General further says that they, the said Albert F. Matlack, John M. Donohoe and James Watson, being then and there officers of election, as aforesaid, did, then and there and thereby, knowingly and wilfully, respectively, violate their official duty, contrary to the provisions of the Constitution of

the State of Delaware, in such case made and provided, and against the peace and dignity of the State.

"ROBERT H. RICHARDS,
"*Attorney-General.*"

## DEMURRER TO AMENDED INFORMATION.

The defendants demurred to the above information, assigning the following causes, viz. :

"1. For that it does not appear in and by the said amended information that any complaint was ever made to any Judge entitled to sit in the Supreme Court of this State, stating that any offence mentioned in any of the provisions of the Constitution of the State of Delaware has been committed in any County of this State or out of the State by the said Albert F. Matlack, John M. Donohoe and James Watson or any of them ; nor does it so appear that any such Judge caused the said Albert F. Matlack, John M. Donohoe and James Watson, charged with any such offence, as aforesaid, to be arrested and brought before him ; nor does it so appear that the said Albert F. Matlack, John M. Donohoe and James Watson were so brought before any such Judge; nor does it so appear that the said Albert F. Matlack, John M. Donohoe and James Watson were by any such Judge severally bound with surety, or, for want of bail, committed for their appearance to answer to any charge of committing any of the offences aforesaid at the then next term of Court of General Sessions in and for New Castle County, to wit, at the February Term, A. D. 1905.

"2. For that it does not appear in and by said amended information that the said Albert F. Matlack, John M. Donohoe and James Watson were ever complained of to any Judge entitled to sit in the Supreme Court of this State of having committed the offenses alleged in the first count of said amended information ; nor does it so appear that any such Judge caused the said Albert F. Matlack, John M. Donohoe and James Watson, charged with the offences alleged in said first count, to be arrested and brought before him ; nor does it so appear that the said Albert F. Matlack,

John M. Donohoe and James Watson, charged with the offences alleged in the said first count, were so brought before any such Judge; nor does it so appear that they, the said Albert F. Matlack, John M. Donohoe and James Watson, were by any such Judge severally bound with surety, or, for want of bail, committed for their appearance to answer to the offences alleged in the said first count, at the next term of the Court of General Sessions, in and for New Castle County, to wit, at the February Term, A. D. 1905.

" 3.   For that it does not appear in and by said amended information that the said Albert F. Matlack, John M. Donohoe and James Watson were ever complained of to any Judge entitled to sit in the Supreme Court of this State, of having committed the offences alleged in the second count of said information; nor does it so appear that any such Judge caused the said Albert F. Matlack, John M. Donohoe and James Watson, charged with the offences alleged in said second count, to be arrested and brought before him; nor does it so appear that the said Albert F. Matlack, John M. Donohoe and James Watson, were ever brought before any such Judge; nor does it so appear that they, the said Albert F. Matlack, John M. Donohoe and James Watson were by any such Judge severally bound with surety, or, for want of bail committed for their appearance to answer to the offences alleged in the said second count of said amended information to the then next term of Court of General Sessions, in and for New Castle County, to wit, at the February Term, A. D. 1905.

" 4.   For that it appears in and by the said amended information, that the prosecution of the crimes therein alleged is by information and is not by presentment or indictment found by a Grand Jury drawn, summoned and qualified according to the law of the State of Delaware.

" 5.   For that it does appear in and by said amended information that the said Albert F. Matlack, John M. Donohoe and James Watson were not examined and committed or severally held to bail

by a Judge or Justice of the Peace to appear and answer to the offences alleged in the first count of said amended information at the then next term of Court of General Sessions in and for New Castle. County, to wit, at the February Term, A. D. 1905.

"6.  For that it does appear in and by said amended information that the said Albert F. Matlack, John M. Donohoe and James Watson were not examined and committed or severally held to bail by a Judge or Justice of the Peace to appear and answer to the offences alleged in the second count of said amended information at the then next term of Court of General Sessions in and for New Castle County, to wit, at the February Term, A. D. 1905.

"7.  For that it does not appear in either of the two counts of the said amended information what official duties the said Albert F. Matlack, John M. Donohoe and James Watson are alleged to have violated.

"8.  For that it appears in and by said amended information in the first count thereof, that there are two separate and distinct offences alleged therein, and that the said count, is, therefore duplicitous.

"9.  For that it appears in and by the said amended information in the second count thereof that there are two separate and distinct offences therein alleged and that said count is, therefore, duplicitous.

"10.  For that it affirmatively appears in and by the second count of said amended information that the said Albert F. Matlack, John M. Donohoe and James Watson were not severally held to bail by George H. Hollis, Esquire, a Justice of the Peace for any of the offences alleged in said second count.

"11.  For that it appears in and by said amended information that there are two separate and distinct counts, each of which said counts purports to allege a separate and distinct offence."

The respective counsel submitted briefs and made oral arguments upon the above demurrer.

LORE, C. J.:—The Court have given to the arguments made upon the demurrer to this information all the care and consideration we could, and we are entirely in accord in the judgment that the demurrer should be overruled, and we therefore do overrule it.

At the request of counsel for defendants, judgment of *respondeat ouster* is entered.

Defendant's counsel asked to note an exception. The Court refused to allow the exception.

A plea of not guilty was thereupon entered in behalf of each of the defendants.

At the trial, the State proved the following facts :

That on the twenty-fourth of September, 1904, there was held in Brandywine Hundred in the Third Election District of the Sixth Representative District a primary election of the Republican party, which election was held under the provisions of *Chapter 393, Volume 20, Laws of Delaware*; that the officers who conducted said election were Albert F. Matlack, one of the defendants who was the inspector and acted as such in the holding of said primary election, John M. Donohoe, who was one of the judges and acted as such in the holding of said primary election, James Watson, who was the other of the judges and who acted as such in the holding of the said primary election ; they being the three defendants; that Courtland Rice and Alexander Newkirk were the two clerks of the said primary election and acted as such, respectively, in the holding of the said election. That the three defendants first above named had, as contended by the State from the facts proved, actual knowledge, or at least were charged with actual knowledge, of the particular duties which the information alleged they had violated. That as a result of the election it appeared that return was made that one Isaac C. Elliott, who was a candidate at the election for the nomination for Levy Court Commissioner from the Third Levy Court District in the County of

New Castle, had received fifteen votes for the said office; that the return was taken from the tally sheets which were kept by Courtland Rice and Alexander Newkirk, the two clerks who were named. It was further proved by these two clerks, and other persons who were in the room at the time of the count, that the number of votes tallied by them upon these tally sheets and afterwards placed upon the return or certificate, was the exact and actual number of votes read out by the defendant Albert F. Matlack (who read all the ballots at the said count), as having been cast at the primary election for Isaac C. Elliott. It was further proved, as a matter of fact, that at said primary election sixty-four qualified voters of that election district were present at the election and cast their ballots for Isaac C. Elliott for said office; and in the neighborhood of fifty of the sixty-four electors who testified that they voted for Isaac C. Elliott, swore that they saw that the actual ballots which they voted were placed in the ballot box by said Matlack; that after these ballots voted for Isaac C. Elliott were placed, to the certain knowledge of the voters, in the ballot box, the ballot box remained during the whole election, until the close of the polls, in one position, namely, in a window of a school house in Brandywine Hundred, where said election was held, being situated near Shellpot Park; the judges and the other officers, aside from the inspector, being in various places in the room, and that the latter was at the window and had the ballot box placed either on the window ledge or on a small table directly in front of the window throughout the whole election, in plain view of persons who were on the outside and who were voting, there being a number of persons around the window and around the house throughout the period in which the primary election was conducted. That the ballot box used was a ballot box with glass sides, being the usual type of ballot box used for primary elections in New Castle County, with a slot in the top for the reception of the ballots. The ballot box itself was produced and admitted in evidence. It was further proved by a number of witnesses that the ballot box immediately upon the close of the voting was removed by the inspector Matlack from its position in

front of the window to a desk in the school room. A number of witnesses testified that from the time the window closed and during the removal of the ballot box there were persons in plain view who saw what was done and saw the ballot box and that there was no opportunity for the ballot box to be opened or in any way interferred with or for anything to happen to it in the way of substitution of boxes or substitution of ballots, or anything of that sort; that the ballot box having been removed from its position at the window to the desk, which occupied but a few seconds of time, in a very few minutes, or so soon as the tally sheets could be prepared, the ballot box was opened by the inspector Matlack, to the knowledge of the witnesses, there being a number of electors of the said election district in the room throughout the count, and the count began. That the method by which the votes were counted was the following: The ballot box being on a desk in the school room was opened by the inspector Matlack, who took the ballots out, read them aloud, and standing not exactly behind him but looking over the shoulder of Matlack, or in a position in which he seemed to be looking over the shoulder of Matlack the inspector, was James Watson, one of the judges, and sitting at a desk in the school room but a short distance from Matlack so that one could reach the other, was the other judge, John M. Donohoe; that after reading each of these ballots, the ballot was handed by Matlack to Donohoe and Donohoe took each ballot and folded it up and placed it in the other smaller box provided for that purpose; that during the reading of the ballots the two clerks kept a tally sheet and recorded the votes, and persons who overlooked the work of these clerks and who also kept private tallies, testified that the tally was properly kept; that upon the finishing of the reading of the ballots the certificates were made up from the tally sheets and the certificates were signed by the election officers, and the votes, tally sheets and proper papers were put in the ballot box and the same was then sealed. It was further proved that the ballot box came into the possession of Emmit F. Stidham, the then Sheriff of New Castle County, on

the morning of Monday following the primary election, which primary election was held on Saturday, and said ballot box was identified by a private mark made upon same by said Stidham as being the same ballot box which he had delivered into the possession of Matlack on Friday before the election and that the said ballot box had been in his (Stidham's) possession from the time of its re-delivery to him until the day of trial.

In the course of the trial, the following evidence was offered and questions raised and ruled upon :

*George Janvier*, Deputy Clerk of the Peace for New Castle County, was sworn as a witness on behalf of the State.   Whereupon Mr Hayes, of counsel for defendants, objected to the State's offering any evidence whatever under the above information, for the reason stated in the argument on the demurrer, viz. : that the Court had not jurisdiction to try the cases.   The objection was overruled and defendants noted an exception.   Said witness then testified that as Deputy Clerk of the Peace, he had in his possession three certain bail bonds given by the defendants, Matlack, Watson and Donohoe, returnable at the February Term of the Court cf General Sessions, 1905.   Said papers were thereupon produced and marked for identification.

*George H. Hollis*, a Justice of the Peace for New Castle County, being produced and sworn as a witness for the State, after identifying the papers above marked for identification, was asked the following question :   " Will you look at the signatures at the bottom of the paper marked ' A for identification' and state whether you saw those signatures made by Albert F. Matlack, principal, and Grantley Postles, his surety."—(Mr. Richards here explains that the paper is not signed by the Justice of the Peace, and for that reason he is asking him to prove the signatures.)

*Mr. Hayes :*—We object.   This is an instrument under seal, and your Honors have decided that such an instrument can be proved in one way only, and that is by the attesting witness.

*Mr. Richards:*—There is no attesting witness. We can prove the handwritting, the signature itself.

*Mr. Hayes:*—Under the statute (*Revised Code 732-733*) I contend that the bail bond should be attested by the Justice of the Peace, and unless so attested, it is not a bail bond.

LORE, C. J.:—This is in the very language of the statute. We overrule the objection.

A. I did see the signatures of Albert F. Matlack and Grantley P. Postles written upon that paper.

The above mentioned bail bond was then offered in evidence. Counsel for defendants objected on the ground already raised, and also on the ground that it was not a bail bond supporting the allegations contained in the second count of the information.

LORE, C. J.:—It purports to be taken in this case. We overrule the objection. It is admitted in evidence.

(The bail bonds executed by the other two defendants were proved in like manner and admitted in evidence over the objection and exception of defendants' counsel.)

*Alexander Newkirk,* having testified that he was one of the clerks at the primary election and kept the tally sheet, was asked by the Attorney-General the following questions:

Q. When was the oath administered to you, if it was administered at all? A. About one o'clock.

Q. By whom? A. Mr. Matlack, the gentlemen sitting there (indicating the defendant Matlack).

Q. Did you see him administer the oath to anybody else? A. Yes, sir.

Q. To whom? A. Mr. Donohoe and I took it at the same time, and then I saw him administer it I think to Mr. Watson and Mr. Rice later.

Q. I shall read to you something from this book (*Volume 20, Laws of Delaware*) and ask you to pay attention and see whether you recognize or remember any of the things that I shall read to you as being things that were in the oath administered to you by Mr. Matlack—first, however, I will ask you whether you signed any written oath? A. No, sir.

Q. Did you see Mr. Donohoe or Mr. Watson or Mr. Rice sign any written oath? A. No, sir.

Q. Now pay attention to what I read and see if you recognize anything in here as contained in the oath that was administered to you: (The Attorney-General then reads the oath required by law to be administered)? A. I recollect about the vote of an alien, and about not receiving any money. I think that is about all that I recollect.

Q. Was that the same oath which you heard administered to Watson, Donohoe and Rice? A. No, sir.

Q. You mean you don't remember, or that it was not the same? A. It was not the same.

Q. How do you know what the oath was that was administered to them? A. I don't remember the oath now, but it was not that long,—not to Mr. Rice and Mr. Watson.

Q. Who administered that? A. Mr. Matlack.

Q. Did he or not read it out of a book? A. I think he did.

Q. I will ask you whether or not on the twenty-fourth of September, 1904 (that is, at the time of this primary election) you were a qualified voter to vote at the primary election in the Third Election District of the Sixth Representative District of New Castle County in this State?

(Objected to by Mr. Hayes, of counsel for defendants, on the ground that the law provides that the evidence of that fact is the registration books, which is the best evidence.)

*Mr. Richards :*—Of course I have the books of qualified voters for the primary election for that district and will produce them, but I ask this because it has been absolutely and distinctly ruled upon by

the Court in the case of *State vs. Bell* (unreported,) where the Court permitted the person himself who voted to say that he was qualified to vote.

LORE, C. J. :—The objection seems to be that you are asking for a conclusion of law.

Q. Did you vote at the primary election held in the Third Election District of the Sixth Representative District of this county on the 24th of September, 1904 ?

*Mr. Hayes:*—I object to that for the same reason, that the registration book is the best evidence and should be produced.

*Mr. Richards:*—The point now involved is not as to the qualification of these people for voting, but as to the fact of whether or not they voted. The objection Mr. Hayes makes is the same objection that I made in the Bell case, but the Court held that such records were not the only evidence, nor the best evidence. They are not a record.

LORE, C. J.:—We think that question is admissible.

A. Yes, sir.

Q. Whom did you vote for at that primary election for Levy Court Commissioner for the Third Levy Court District in New Castle County ?

(Objected to by Mr. Reinhardt, of counsel for defendants, on two grounds: *First,* that there is no allegation in the information that he voted for a man who was to be selected as a candidate for the office of Levy Court Commissioner, nor that votes were given for a man as a candidate for such Levy Court Commissioner, but the allegation in the information describes absolutely the ballot that was used at the election, that it was for the incumbent of the office of Levy Court Commissioner. *Second,* that a voter cannot testify in a trial of this character for whom he voted ; that it is

contrary to public policy, and the primary election law provides that the vote shall be by ballot and it has always been held to be a secret ballot, and therefore the voter will not be allowed to testify for whom he voted.)

*Commonwealth vs. Berry, 98 Kentucky (Supreme Court), 394.*

LORE, C. J.:—We think that the provision for secrecy attending the voting gives the voter the privilege of disclosing how he voted or not, as he wishes. There is nothing to prevent his disclosing how he voted if he sees proper to do so. We think the testimony is perfectly competent, to prove how he voted.

*Mr. Reinhardt:*—I presume your Honors will instruct the witness that he is not compelled to reply to that question.

LORE, C. J.:—We do not; we simply state it is competent testimony. It is not a criminal matter that we are bound to instruct him.

(The witness then replied that he voted for Isaac C. Elliott.)

Q. Will you look at the paper I now hand you, marked " N for identification," and state whether or not that is one of the forms of ballot used in the primary election in question ?

*Mr. Hayes:*—We object. We would like to know something about the purpose for which this question is asked. It is not identified in any way in this case.

*Mr. Richards:*—I am not offering it in evidence.

*Mr. Hayes:*—The best evidence of the form of ballot is the ballot itself. We object to the question.

LORE, C. J. :—We think it is admissible.

A. Yes, sir.

*Mr. Richards :*—I offer this paper (being the ballot above refered to) in evidence for the purpose of showing the manner in

which Isaac C. Elliott was voted for as printed on that ballot, and showing that it conforms to the manner in which he is designated as having been voted for in the information. This identical ballot was not used, but it is a ballot like all the others that were used at that election. This is one of the official ballots printed under the auspices of the county committee.

LORE, C. J. :—We think if you can show that this is exactly similar to the ballots used and voted at that election that it is proper ; but as to its being one of the forms, we don't know that this form was voted at all ; there is nothing proving here that it was.

Q. Was there more than one kind of ballot used in the voting at that primary election ? A. I did not see but one kind.

Q. Look at that again and state if that is exactly the ballot that was used in the voting at that primary election and the only ballot that was used ? A. That is all the kind that I saw.

BY JUDGE BOYCE :

Q. You did see that kind ? A. Yes, sir.

*Mr. Richards :*—There is only one kind that can be used under the law.

LORE, C. J. :—We think it is admissible under that state of proof.

*William Wilson, Jr.*, having testified that he resided in Christiana Hundred and lived there during the year 1904 and that during that year he was appointed and acted as qualifier of primary election officers, and that acting in such capacity he had administered the oath to Albert F. Matlack, one of the defendants, on August 8th, for the primaries; the witness was asked if he had the oath with him, to which he replied that he had not, but that he had one similar to it ; that the other one had become mislaid.

Q. Do you know where it is now? A. I don't know exactly where it is now, no, sir.

Q. Was it signed by him at that time? A. It was.

Q. Are you able to produce it now? A. No, sir; not at this time; I think I could hunt it up and get it.

*By Mr. Reinhardt:*

Q. Have you made any search for it? A. No, sir.

*By Mr. Richards:*

Q. Will you produce the copy of that oath, which you say is just like the one you administered to Matlack? A. Yes, sir.

Q. What was the oath you administered to him at that time?

*Mr. Reinhardt:*—I object. That oath is in writing and signed, and it has not been shown that any search has been made nor any effort made to obtain it. It certainly is the best evidence, unless it is shown to be absolutely lost and that it cannot be found; in no other way can he prove this oath.

(The Court advised the witness to make search for the oath and to report the following morning, at which time he was again placed upon the stand, and questioned by the Attorney-General as follows):

Q. Have you since yesterday made a thorough search for the paper writing containing the oath which was subscribed to and sworn to by Mr. Matlack, that you mentioned yesterday? A. I have.

Q. Did you succeed in finding it? A. I did not.

Q. Do you know where it is? A. I do not.

Q. Have you a copy of that oath? A. I have a copy, the same I swore every inspector in on.

Q. The same oath that you gave to every inspector? A. Yes, sir.

Q. Will you produce that? A. Here it is (witness produces paper).

Q. Is that the exact copy of the oath which you administered to Mr. Matlack? A. It is.

*Mr. Richards :*—I offer that in evidence, except the signature.

*Mr. Reinhardt:*—We object to the proof of any oath administered to Albert F. Matlack, under Section 5 of the Primary Act; that oath is intended to be, as I see it, the same oath which is found in *Section 5, page 328 of Volume 20, Laws of Delaware,* a part of which oath is incorporated in and used as part of the charging part of the information in this case. That provision, Section 5, has been repealed by the passage of the new Constitution. Article 14 gives the oath of office which we contend is the only oath of office which a public officer, such as Albert F. Matlack was, is required to take. That oath is as follows: " I do solemnly swear (or affirm) that I will support the Constitution of the United States, and the Constitution of the State of Delaware and that I will faithfully discharge the duties of the office of            , according to the best of my ability ; " and at the bottom of the same Article is found this language : " No other oath, declaration or test shall be required as a qualification for any office of public trust." The introduction to the said Article provides that the said oath shall be taken by " members of the General Assembly and all public officers, executive and judicial, except such inferior officers as shall be by law exempted," etc.

We contend that when Matlack was elected inspector the constitutional oath should have been administered to him.

LORE, C. J.:—Do you claim he was an executive or judical officer.

*Mr. Hayes :*—No, sir ; he was a public officer, we claim.

*Mr. Reinhardt:*—We cite the case of *Bishop vs. Hill (New York), 74 Hun, 289.*

LORE, C. J.:—Does not that clause of the Constitution limit it to public officers, executive or judicial—do you mean to say now that that is separate from the other and that the other oath does not qualify him at all?

*Mr. Hayes:*—No, sir; we don't think it is necessary, and if it does he is a judicial officer. He has to pass upon the qualification of voters.

*Mr. Reinhardt :*—We hold that this is an office of public trust and that no other oath should be required than that prescribed in the Constitution.

In one of these cases I shall cite the language is exactly the same as in our own Constitution, and in the other it is similar.

BOYCE, J.:—What is the case in support of?

*Mr. Reinhardt:*—In support of my contention that the constitutional oath did away with every other oath that the law had imposed upon these officers.

BOYCE, J.:—Suppose that should be true and it should appear that some other oath was administered, such as we have a copy of here, may not that oath be offered in evidence, or not?

*Mr. Reinhardt:*—No, sir; because it is absolutely void. There is no oath required to be taken by this inspector except the constitutional oath. We contend that *Section 5 of the Primary Election Act* is in contravention of or in conflict with the new Constitution, and therefore any oath under Section 5 is not admissible in evidence here.

LORE, C. J.:—You claim that the fact that some other oath was administered is not admissible in evidence?

*Mr. Reinhardt:*—Yes, sir.

PENNEWILL, J.:—Does the oath given include the constitutional oath?

*Mr. Reinhardt:*—No, sir.

(Mr. Reinhardt here cites the case of *Bradley, appellant, vs. Clark, respondent, 133 California, 196.*)

BOYCE, J.:—The question here is not whether this officer, as an officer, at the time, had taken the constitutional oath; but the question is whether whatever oath was administered is admissible in evidence in this case.    Do either of your cases go to that point?

*Mr. Reinhardt:*—No, sir; but if *Section 5 of the Primary Election Act* is inconsistent with the provisions of our Constitution, I take it then that no evidence as to anything that was done under Section 5 is admissible in this case, that no duty rested upon Matlack and no charge rested upon him under Section 5.

LORE, C. J.:—We do not think your authorities apply to the question of the admissibility of this paper.    That is a different question from the one that is now before us.    The question before us is as to the admissibility of this paper in evidence.

*Mr. Reinhardt:*—We object to this paper on the ground that it is irrelevant, has nothing to do with this case, and that the only oath required to be administered to this defendant Matlack is the constitutional oath that I have before alluded to.

LORE, C. J.:—We overrule your objection, and admit the paper in evidence.

(Said oath was in the following form, to wit):

" OATH OF PRESIDING OFFICER AND JUDGES.

" I do solemnly swear (or affirm) that in the primary election to be held on the 8th day of August, A. D. 1904, I will not knowingly or wilfully receive or consent to the receiving of the vote of any alien, and also that I will not receive or consent to the receiving of the vote of any person whom I shall believe not entitled to

vote, unless my associates shall adjudge such person entitled to vote. That I will not receive, nor reject, nor concur in the receiving or rejecting any vote through partiality or bias and that I will determine every matter that shall come before me and perform every act and duty by law required of me, touching the said primary election, truly faithfully and impartially, according to the best of my skill and judgment; that I will cause the ballots that shall be taken at said primary election to be fully read and ascertained, and a true statement thereof made, according to the best of my knowledge and ability; that I have not received, nor will not receive directly or indirectly from or through any candidate to be voted for at said primary election, or any representative of any such candidate or person, any money, pay, or other valuable thing or reward; that I have not been promised, or in any manner led to believe that I will at any time directly or indirectly receive any money, pay, or other valuable thing or reward from such candidate or representative of such candidate or other person other than that provided by this Act, and if I shall discover any partiality or unfairness or corruption in the conducting of said primary election, I shall disclose the same to the executive authority that shall have directed the holding of the said primary election and to the Attorney-General, to the end that the subject may be investigated, so help me God (or so I solemnly affirm)."

It was admitted that the sixty-four persons who testified that they voted for Isaac C. Elliott for Levy Court Commissioner in the Third Election District of the Sixth Representative District of New Castle County on September 24, 1904, were shown by the books of qualified voters for said primary election (which books were admitted in evidence) to be qualified voters in said district on the 24th day of September, 1904.

When the State had rested its case, counsel for defendants moved the Court to dismiss, acquit and discharge the said defendants, for the following reasons:

1. That it appears by the record and evidence in the cause produced on behalf of the State, that the Court has not jurisdiction to try said defendants on such information :

(*a*) Because said defendants never had any examination before a Judge or Justice of the Peace;

(*b*) Because the prosecution is by information and not by indictment found by the Grand Jury, and trial of facts by petit jury;

(*c*) Because it appears that there was no such duty imposed by law upon the defendants as is alleged in the information;

(*d*) Because it appears that *Section 5, Chapter 393, Volume 20, of the Laws of Delaware,* is nugatory, and of no effect in law;

(*e*) Because the State has not proved beyond a reasonable doubt the guilt of the defendants as alleged in the information;

(*f*) Because it does not appear from the evidence that the defendants knowingly and wilfully violated their official duties, as alleged in said information;

(*g*) Because it appears that none of the defendants read any of the ballots except the defendant Matlack.

2. From the evidence it appears that the defendant Watson was not one of the officers who held said election, as alleged in the information, but on the contrary it does appear that the persons who held said election were the defendants Matlack, Donohoe and one Alexander J. Newkirk.

(After hearing an extended argument by counsel upon both sides, the Court declined the motion in the following language):

LORE, C. J.:—We formally decline to discharge the defendants at this stage of the case, and direct you to go on with your testimony in behalf of the defendants.

(The defendant Matlack testified concerning his possession of the ballot box and the facts and circumstances surrounding the conduct of the said primary election but denied that he had misread any of the ballots. He further testified in cross examination as follows):

## ALBERT F. MATLACK.

### CROSS EXAMINATION.

*By Mr. Richards:*

X.   You got the ballot box on the day, or the evening of the day the sheriff delivered it to your house, did you not?   A. I got the box that evening.

X.   And you placed that box, you say, in the dining room on the floor?   A. I did; yes, sir, after I came home.   I found it sitting on a chair and I placed it on the floor out of the road.

X.   That was on what day, if you recollect, that you placed it there, or what evening?   A. I do not know; some time along the middle of the week; maybe Wednesday or maybe Thursday.

X.   Was it Wednesday or Thursday?   A. Either one of those days; yes, sir.

X.   Was it there on Friday, do you know?   A. Yes, sir; it was there on Friday.   I think it was either Wednesday or Thursday.

X.   Did you see it there on more than one time during the day on Friday?   A. I saw it there at noon, and it was there at night when I came home.

X.   Did it look like the same box that you had put down there?   A. They all looked alike.   I did not examine it.   It might have been and might not have been, so far as I know.

X.   I am not asking you whether it was or not.   I ask you whether it looked like the same box?   A. It looked like the same box, yes, sir, by looking at it.

X.   You say you saw it again on Saturday?   A. Yes, sir; I carried it with me on Saturday to the school house.

X.   And you went to the school house about what time ?   A. It was between one and half past one when I got there.

X.   And who was there?   A.  Well, I don't know ; I cannot say who was there—probably Mr. Newkirk and Mr. Rice may have been there.   If they were not there, I don't think there was anyone.   I am not positive.

X.   Was the school house unlocked when you got there ?   A. No, sir.

X.   When the school house was unlocked what did you do with the ballot box ?.   A. I took it in the school house, and prepared to open the polls ; put it in this middle window on the side of the school house, opened the window and got the ballot box ready and took the stuff outside of it.

X.   Did the box you took to the school house look like the same box that had been delivered to your house but a few nights or days before ?   A. They all looked alike.

X.   What do you mean by saying they all looked alike—did you have any more than one box delivered to you ?   A. No, sir.

X.   Did that box look like the same box that was delivered there ?   A. Yes, sir.

X.   And to the best of your judgment, was it the same box ? A. Yes, sir.

X.   And when you went in the school house you placed it on what ?   A. I think I placed it on one of the desks until I got the papers and other box out from the inside of it.   Then I put it in the window.

X.   Was that when the polls opened, when you put it in the window ?   A. Yes, sir.

X.   You state that two or three times during the afternoon you went out for short intervals.   For various purposes which you have designated ?   A. Yes, sir.

X.   During all the other times—that is, when you were inside the school house and during the voting—were you in charge of the ballot box at that window ?   A. Around close to the window.   I may have walked up and down the aisles.

X. Were you in charge of the ballot box? A. Yes, sir; I left nobody else in the charge of the ballot box; did not ask anybody else.

X. Did the box disappear from the window sill while you were there in charge of it? A. No, sir.

X. Did anybody tamper with it while you were there in charge of it? A. No, sir.

X. During the voting was the box locked there? A. Yes, sir.

X. Who had the key? A. As I stated, the key was hanging on the hasp where the lock goes through.

X. But not on the lock? A. No, sir.

X. It was tied on to the hasp? A. Yes, sir.

X. When you went out on these two or three occasions, whom did you leave in charge of the ballot box? A. No one in particular. I left the judges and the clerk.

X. Do you know whether anybody voted while you were out? A. I do not know.

X. But you left the judges in charge of the ballot box when you went out? A. I left them sitting there. I did not ask them to look out for it, but took it for granted that they were in care of it probably.

X. You would not go out and leave it in charge of nobody, would you? A. No, sir.

X. The polls closed at what time? A. At seven o'clock.

X. At each time when you returned from having gone out on these two or three occasions that you stated, did you see any difference in the ballot box? A. No, sir.

X. It looked just the same? A, Yes, sir.

X. Was sitting in the same place? A. Yes, sir.

X. Did it look as though it had been molested in any way? A. No, sir.

X. Did it look to be in the same condition? A. Yes, sir.

X. Were the keys in the same condition? A. Yes, sir.

X. When you went out on these two or three occasions did

you ask either of the two judges, or both of them, to keep charge of the ballot box ?   A. Not to my knowledge, no, sir.

X.   How close were they sitting to the ballot box ?   A. Within three or four feet, or probably five feet.

X.   Facing the window where the voting was going on ?   A. They were more side to the window.   They sat on the row of scholars' desks.

X.   Did they sit in the row of desks next to the window ? A. Yes, sir; next to the window.

X.   You have stated that all the ballots handed to you by the voters were placed by you in the box ?   A. Yes sir.

X.   That is, all that voted—I don't know whether you rejected anybody or not ?   A. Yes, sir.

X.   Everybody that was allowed to vote, you put his ballot in the box ?   A. Everybody except that one man who testified here yesterday that he put his own in.   He did put his own in ; did not give me time to get hold of it.

X.   And others tried to put it in ?   A. A great many tried to put it in.

X.   You say in about a minute or two of seven o'clock— which I understand was the time for closing the polls?   A. Yes, sir.

X.   You announced the number of votes cast ?   A. Yes, sir.

X.   Did you announce that from the window where you stood?   A. Yes, sir.

X.   And did you close the polls directly at seven o'clock.   A. Yes, sir ; by my watch.

X.   Did you make this announcement by your watch.   A. Yes, sir.

X.   And you say it was about a minute of seven ?   A. Yes, sir.

X.   And then you pulled the window down ?   A. Yes, sir.

X.   And went over, I understood, and took the little box where—to the teacher's desk ?   A. To the teacher's desk, the little box, and took the lamp off the stove.

X. Then you came back and got the big box? A. I got the paper and tally sheets out of the teacher's desk and then came back and got the big box.

X. How many minutes did it require you to take the little box and lamp over to the teacher's desk and get the papers out before you came back to get the big box? A. A couple or three minutes, I suppose—two to three minutes.

X. When you came back for the big box was it in the same place? A. Yes, sir.

X. And seemed to be in the same condition? A. Yes, sir.

X. Was it still locked? A. Yes, sir.

X. And looked like the same box? A. Yes, sir.

X. Was the window in the same condition as when you had left it? A. I think so, yes, sir.

X. Had the shutters been pushed to at that time? A. The shutters I don't think had. I could not say about that.

X. You are not positive about that? A. No, sir; I would not say.

X. When you went to lock the shutters later in the evening you found them pushed to? A. They had been pushed to, but they were a little open on a little crack I think; that was what called my attention to the fact of them not being locked.

X. And you took the box over from the window sill then to the teacher's desk? A. Yes, sir.

X. Did you unlock it then? A. Yes, sir.

X. It was still locked? A. Yes, sir.

X. The key was in the same position? A. Yes, sir.

X. And the lock in the same condition as when it had been on the window sill? A. Yes, sir; the lock was locked.

X. Did you unlock it and did you start to count the ballots right away? A. As soon as the clerks were ready with their sheets.

X. Who were the clerks? A. Mr. Rice and Mr. Newkirk.

X. Who, if anybody, did you swear in as clerks? A. I swore Mr. Watson and Mr. Rice as clerks.

X.   Then you did swear Mr. Watson in as a clerk?   A. Yes, sir.

X.   By Mr. Watson, do you mean this defendant here?   A. Yes, sir.

X.   If you know, why did he not act as clerk?   A. Well, I did not know much about that.   I did hear something said about Mr. Newkirk acting as clerk in his place as he was a better penman probably and might do it a little quicker.   That is my knowledge of it.   I did not pay much attention to it.   It was immaterial to me I thought, just so it was done and done right.

X.   Did you hear anything said about Mr. Watson and Mr. Newkirk changing places?   A. No, sir, not that I can recall; any more than just what I have told you that I heard some little talk. I really don't know who it was talking.

X.   But at any rate you had sworn in Mr. Watson as clerk and you did see Mr. Newkirk act in his place, did you, as clerk? A. Yes, sir.

X.   What did Mr. Watson do while you read the votes?   A. He stood back of me and looked over my shoulder at them.

X.   Did he have any talk to you or you to him while the reading went on?   A. No, sir.

X.   There was nothing said?   A. No, sir—there was something said, too.   There was some little discussion I believe about a ballot.   We fixed that up.

X.   That discussion was between you and Mr. Watson, was it?   A. Between the three of us, if I remember rightly.   I read a name wrong.   It has nothing to do with this case.   It was for Coroner I think, and I got the wrong name and Mr. Donohoe called my attention to it and that was discussed probably between him and me, or Mr. Watson and me; I cannot tell which.

X.   As you took the ballots out to read them, from Mr. Watson's position where he was standing, could he read them if he wanted to?   A. I think so, yes sir; no doubt but what he could.

X.   And after reading the ballots you handed them to whom? A. To Mr. Donohoe.

X. And he was about how close to you? A. Only the width of this teacher's desk, whatever that was.

X. He could reach them with his hand, could he, from your hand? A. Yes, sir.

X. What did Mr. Donohoe do with them, if you know? A. Well, I know that he put them in the smaller box, and some of them I could see from the corner of my eye looking at them; but I did not pay any attention to that.

X. But you know that he did put them in the smaller box? A. Yes, sir.

X. But you took all of the ballots out of the box yourself and you did all the reading aloud yourself? A. I did; yes, sir.

X. And as you read off those ballots, I understand you to say (correct me if I am wrong) that you first read the designation of the officer? A. Yes, sir.

X. Say, for instance, Coroner or Sheriff, or whatever it was? A. Yes, sir.

X. Then you read the names of the candidates who were being voted for under that office? A. Yes, sir.

X. And I presume as you took out a ballot you only read the names of the men who were not marked off? A. That is all; yes, sir.

X. And you testified, in reply to the question of your counsel, that you read all of those ballots correctly in all respects? A. Yes, sir; to the best of my knowledge.

X. Exactly—I think as he asked you—as they appeared on the face? A. Yes, sir.

X. After you had so read those ballots, I understood you to say that a certificate was made out? A. Yes, sir.

X. From what? A. Made out from the tally list.

X. And you signed the certificate? A. Yes, sir.

X. Did you sign that signature of your name there on the paper marked "State's Exhibit M"? A. I did, sir.

X. There is a writing of your name down there which is crossed out with a pen. Will you examine that? A. Yes, sir.

X.   You remember that, I presume?   A. I signed it in the wrong place merely ; that is all that is.   I crossed it out and signed it in the right place.   It was my first experience in this business, and I got a little mixed up between the judge and inspector.

X.   Did you see Mr. Donohoe sign?   A. Not that I remember, no, sir.

X.   Do you remember seeing any of the others sign that paper?   A. Not that I recall, no sir ; did not see them.

X.   Do you remember whether Mr. Watson signed?   A. I could not say ; no, sir.

X.   How many certificates did you sign?   A. Two I think.

X.   After the counting of the votes and the signing of the certificates, I understood you to say that one certificate and one tally sheet were put in the box?   A. Yes, sir.

X.   With what?   A. With the ballots ; in the same box with the ballots.

X.   That is, the ballots were put in the little box?   A. I thought you were  talking of the tally sheets.

X.   During the voting the ballots were put in the large box?  A. Yes, sir.

X.   And you took them out of there, read them and handed them to Mr. Donohoe and he put them in the little box?   A. Yes, sir.

X.   And the ballots were placed in there with the tally sheet and certificates inside?   A. Yes, sir.

X.   Then what was done ?   A. The little box was sealed up and then put in the big box.

X.   Do you remember who it was that suggested breaking the seal  to  see  whether  there  had  been some mistake or other made ?  A. No, sir.

X.   Did you suggest it?   A. No, sir.

X.   Whom did you first hear talk about breaking the seal?  A. I cannot remember who it was, any more than there was some discussion as to some of the papers.   That is my understanding of it.

X.   Do you remember who entered into the discussion at all?
A.  I think it was between Mr. Donohoe and someone else.    I don't
know who the other man was.    I cannot say; would not like to
begin to say.

X.   Was it Mr. Tyre?    A.  No, sir, because he had nothing
at all to do with the election.

X.   Was he there?    A.  I don't think so, not at that time.

X.   Not during the count?    A.  He was in and out of the
room I think during the count.

X.   You and  he went away together did you not?    A.  We
did; yes, sir.

X.   And there were three lamps you say lighted in the school
house during the count?    A.  Yes, sir.

X.   You think you left the school house, you say, about
twenty minutes after nine?    A.  Somewhere about that; yes, sir.

X.   And the polls closed at nine?    A.  I had forgotten that.
If the polls closed at nine, I should think it was somewhere between
fifteen and twenty minutes after nine.

X.   Twenty minutes after the polls closed?    A.  Yes, sir.

(Mr. Hayes, of counsel for defendants, here inquires whether
Mr. Matlack and the Attorney-General are not referring to twenty
minutes after the " count ceased " rather than " after the polls
closed.")

*Mr. Richards:*—I mean after the count closed.

*The Witness :*—Yes, sir; that is what I mean.

X.   You went with Mr. Tyre?    A.  Yes, sir.

X.   Where did you go with Mr. Tyre?    A.  I went with Mr.
Tyre to the pike.    I had his team.

X.   From the school house to the pike?    A.  Yes, sir.

X.   From the school house itself, where did you go?    A.
From the school house we went down to the pike.

X.   From the school house, did you not go to where the team
was?    A.  The team was standing out in front of the school house.

X.   Did you or not take the ballot box with you?    A.  Yes,
sir.

X.   During the count, while you were taking those ballots out and reading them and Mr. Donohoe was reading them and placing them in the little box, were they tampered with in any way?   A. No, sir; not with my knowledge.

X.   You were there and could have seen it if anybody had tried to?   A. Yes, sir.

X.   And after they were put in the box and sealed up, were they tampered with then?   A. No, sir.

X.   When the box was unsealed because of this suspected mistake, were the ballots tampered with then?   A. No, sir.

X.   And then the box was resealed, was it?   A. Yes, sir.

X.   What was done with the little box then?   A. It was placed in the big box.

X.   Then what was done with the big box?   A. It was locked up.

X.   Who locked it up?   A. I don't know.   I may have locked it.   I cannot remember that.

X.   After it was locked up who took the key?   A. I did.

X.   Who took the box?   A. I did, sir.

X.   Where did you go with the box from the school house? A.  I took it home with the team.

X.   From the school house to the team?   A. Yes, sir.

X.   And you got in, did you?   A. Yes, sir.

X.   Who was in there besides you?   A. Mr. Tyre.

X.   Anybody else?   A. No, sir.

X.   You drove with Mr. Tyre down to the pike?   A. Yes, sir.

X.   In the taking of the box from the school house to the team, was it molested in any way?   A. No, sir.

X.   Was there any opportunity to tamper with the ballots? A. No, sir.

X.   Or to substitute other ballots?   A. No, sir.

X.   Or to substitute another box?   A. No, sir.

X.   While you drove in the carriage with Mr. Tyre was the box or the ballots tampered with?   A. No, sir.

X.   Was there any opportunity to substitute another box or other ballots?   A.  No, sir.

X.   You went to the pike with Mr. Tyre?   A.  Yes, sir.

X.   What did you do when you got to the pike?   A.  Well, if I remember correctly, I think we went down and Mr. Tyre was going to Holly Oak, or wanted to go to Holly Oak.  That is, he talked about that before we got to the pike, and then he changed his mind, and if I remember correctly now—it has been a good while ago—I let him out at the bridge; took him down that far—it was out of my road—to the bridge that crosses Shellpot Creek on the pike.

X.   It was your team was it?   A.  No, sir; it was Mr. Tyre's team; and he got out there and said he would walk over, and I turned around and went back to my house.

X.   By yourself?   A.  Yes, sir.

X.   Taking what with you?   A.  The ballot box.

X.   Was the ballot box molested or interferred with from the time you got out of Mr. Tyre's team until the time you got home?   A.  No, sir

X.   Was there any opportunity to substitute another box or other ballots?   A.  No, sir.

X.   When you took that box home, what did you do with it?   A.  Put it in the parlor behind the lounge.

X.   Was anybody home?   A.  Yes, sir.

X.   Who was home?   A.  My wife and son.

X.   Then you came on into town?   A.  I came back to town after I got a little something to eat.

X.   And delivered the certificate to the county committee?   A.  Yes, sir.

X.   When did you next see the ballot box?   A.  On Monday morning.

X.   From Saturday night, when you put the ballot box behind the sofa, until Monday morning, were there people about your house constantly, members of your family?   A.  Yes, sir—I am not sure as to that.   I was away myself all day on Sunday, and my

wife may have gone to church. I cannot tell you. I cannot remember that now.

X. But you next saw the box on Monday morning? A. Yes, sir.

X. Where was it when yon saw it again? A. Right where I had placed it.

X. Did it appear to be in the same condition? A. Yes, sir.

X. Was there anything to indicate that it had been tampered with? A. No, sir.

X. Was it the same box that you had brought there on Saturday night? A. Apparently so.

X. Where was the key? A. I had the keys in my pocket.

X. You had the keys in your pocket all the time? A. I think so. I may be mistaken about that.

X. That is your best judgment? Yes, sir.

X. The glass was not broken then on either side, was it? A. No, sir.

X. The box was still locked on Monday morning? A. Yes, sir.

X. Have you any doubt but that it was the same box? A. No doubt but what it was the same box that I took home, no, sir.

X. While it was there behind your sofa could there have been any substitution of ballots in that box, without your key? A. Certainly not, unless they had had a key that was a duplicate.

X. Not unless somebody had had a duplicate key? A. No, sir.

X. What time on Monday morning was it when you took that ballot box from behind the sofa? A. I judge it was about half-past six or twenty-five minutes of seven.

X. Where did you take it? A. I took it to Mr. Tyre.

X. Did you walk to Mr. Tyre's house? A. Yes, sir.

X. As you took the box from your house to Mr. Tyre's house was it molested in any way? A. No, sir.

X. Were the ballots inside tampered with? A. No, sir.

X. Could there have been then any substitution of ballots or substitution of boxes? A. No, sir.

X. Why did you take the box to Mr. Tyre? A. Because I had not the time to bring it in town. Of course, if Mr. Tyre had not been home or had come to town, or had refused to have brought it, I would have had to have brought it.

X. Mr. Matlack, did not you know that it was your duty to deliver it personally to the sheriff? A. Not exactly; no, sir. I did not suppose at that time that it made any difference.

X. Was not Mr. Tyre a candidate voted for at that primary election? A. He was a candidate voted for. The election was all over and the count had been made. I thought of the matter; the matter came to my mind, but I did not suppose it made any difference at that time.

X. Where was Mr. Tyre when you saw him at his home? A. Mr. Tyre, I believe, came to the front door.

X. Did you give the box into his own hands? A. I believe I did, yes, sir.

X. Did you ever see it after that? No, sir.

X. Have you any doubt but what the box which you delivered to Mr. Tyre was the same box that was left at your house by the sheriff? A. I have; yes, sir.

X. You have doubts? A. Yes, sir.

X. What doubts have you? A. Well, for this reason: The Sheriff claims that the same box that was delivered at my house to me was delivered back to him. Now I claim that the votes as I counted them were counted correctly.

X. What has that got to do with the box? A. Well, the only thing that I can see—if you want me to explain my theory of it—

X. Yes; I would like to have it? A. Is that the box in some way was changed. The box in the first place—the first box—had been spirited away and spirited back again.

X. When was it spirited back, according to your theory? A. That I cannot tell. That may have been some time after the

polls were closed, between the time the polls closed and the count.

X.   That is your theory, is it?   A. Yes, sir.

X.   In the face of the testimony you have just given?   A. I testified that the ballots that I counted were correct—counted correctly—read correctly, I mean.

X.   Have you any doubt that the box which you took home with you on Saturday night after the election was the same one which you delivered to Mr. Tyre?   A. Any doubt but what it was the same box?

X.   The box that you read the ballots out of, whether it was the one you took home that night?   A. The same box.   I have no doubt about that.

X.   And you read those ballots correctly?   A. I did, sir.

X.   In all respects?   A. In all respects, yes, sir.

X.   What time was it you say you delivered the box to Mr. Tyre?   A. I said about seven o'clock, I think—seven or a little after.

X.   What did you do with the key when you delivered the box to Mr. Tyre?   A. When I wrapped the box up that morning at home I fastened the keys to the lock the same as they were when I received the box.

X,   You tied them on?   A. Yes, sir.

X.   Did you or not also deliver to Mr. Tyre the two books of registered voters for the primary election?   A. No, sir—yes sir; I did.   They were in the box.   Of course I delivered them; delivered the whole thing.

Donohoe also denied in his testimony that he had any knowledge of any misreading of the ballots, but stated that when the ballots were handed to him after being read he folded them and deposited them in the small wooden box provided for that purpose and was concerned most of the time in watching the tally sheets of the clerks and in preventing so far as he possibly could the making of errors.   Watson did not testify.

The general reputation of all of the defendants, in the community in which they lived, for honesty, fair dealing, integrity and obedience to the law, was proved to be good.

The State contended upon the proof offered that there was no other possible method by which the great discrepancy in the vote for Isaac C. Elliott, as it appeared upon the certificate and appeared from the reading by Albert F. Matlack, could have occurred than by the misreading of the votes cast for said Elliott, and which misreading, the State claimed, was done in the presence of Watson and Donohoe, the other two defendants, in such a manner as that they must have known the fact that the votes were being misread. Therefore the Attorney-General asked the Court to render a verdict of guilty as to each of the said defendants.

The defendants submitted their case to the Court without argument.

After retiring and considering the evidence, the Court rendered the following verdict:

LORE, C. J. :—The Court would like to say that during the entire progress of this trial we have listened with the utmost attention to the testimony as it has been given upon the witness stand, and we very carefully considered it as it was in progress and also at the conclusion of each day. We listened with the utmost attention because it is a case that we consider requires at the hands of the Court, acting in the dual capacity of judges and jurors, such attention in order to get at the real merits of the case so far as we could from the testimony as disclosed upon the witness stand. We have reached a unanimous conclusion which I will now announce.

The verdict is, guilty as to Albert F. Matlack; guilty as to James M. Watson. Not guilty as to John M. Donohoe.